T.C. Memo. 2009-107


UNITED STATES TAX COURT


HOPKINS PARTNERS, CLEVELAND AIRPORT HOTEL LIMITED PARTNERSHIP,
TAX MATTERS PARTNER, ET AL.,[1] Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 19563-04, 17269-05,    Filed May 19, 2009.
               19877-05.


<u>Stephen L. Kadish</u>, <u>Matthew F. Kadish</u>, and <u>Aaron H. Bulloff</u>,

for petitioner.

<u>John Tkacik, Jr.</u>, for respondent.

---

[1]Cases of the following petitioners are consolidated for
purposes of trial, briefing, and opinion:  Hopkins Airport Hotel
Partnership, Cleveland Airport Hotel Limited Partnership, Tax
Matters Partner, docket No. 17269-05; and Hopkins Partners,
Cleveland Airport Hotel Limited Partnership, Tax Matters Partner,
docket No. 19877-05.  These cases are collectively referred to
herein as "case".

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Judge</u>:  In the instant case, respondent issued notices of final partnership administrative adjustment in which he determined adjustments of $2,323,107, $274,130, $280,685, and $225,469 increasing the income of Hopkins Partners (partnership)[2] for taxable years 2000, 2001, 2002, and 2003 respectively.  The issues to be decided are:  (1) Whether certain leasehold improvements made by the partnership were substitutes for rent; and (2) if so, (a) whether the deductibility of improvements made in lieu of rent is limited to the early period of the lease or to a certain fraction of the total rent expense; (b) whether the transfer of the improvements in issue was illusory; (c) whether the rent credit arrangement in issue (rent credit) lacked economic substance; (d) whether the use of the rent credits was a clear reflection of income; (e) whether the use of the rent credits was an accounting method change; and (f) whether respondent properly proposed an adjustment under section 481(a)[3] for taxable year 2000.

---

[2]For purposes of the instant case, references to the partnership include Hopkins Partners and its predecessors-in-interest.

[3]Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts and certain exhibits have been stipulated. The stipulations of fact are incorporated in this opinion by reference and are found as facts.

The partnership is an Ohio general partnership formed on September 28, 1995.

The partnership operates the Sheraton Cleveland Airport Hotel (hotel). The hotel is at Cleveland Hopkins International Airport (airport) and is owned by the City of Cleveland, Ohio (city).

The partnership operates the hotel and attendant parking facilities under a leasehold interest assigned to it by its immediate predecessor-in-interest. The leasehold interest was created by a lease from the city to a predecessor-in-interest to the partnership during 1957. Thereafter, various entities which were predecessors-in-interest to the partnership held the leasehold/operator interest through a series of lease concessions and modifications between 1957 and 1990.

The partnership currently has the leasehold right to operate the hotel through November 13, 2048.

The Early Leases

The first lease, the Lease by Way of Concession for a Hotel at Cleveland-Hopkins Airport (1957 lease), was executed on December 12, 1957.

The 1957 lease required the partnership to construct and operate a hotel on the airport premises. The 1957 lease had a total term of 31 years, 4 months.

Under the 1957 lease, title to the hotel passed immediately to the city, and upon termination of the 1957 lease, the hotel premises and all structures and improvements thereon were to remain the property of the city with the exception of furniture, furnishings, fixtures, and equipment that were the personal property of the partnership. After the initial 16-month term, the 1957 lease required the partnership to pay rent of the greater of $4,800 per year or a percentage of gross receipts.

The Supplemental Lease by Way of Concession dated July 30, 1962 (supplemental lease), gave the partnership the use of additional land to be used as parking for customers, and the right to sell food and beverages. The supplemental lease also increased the minimum annual rent to $6,000 per year.

The Second Supplemental Lease dated November 14, 1966 (second supplemental lease), provided additional land for parking; increased the minimum annual rental to $75,000; and extended the term to 35 years from the date of execution. The second supplemental lease also required the partnership to construct an addition to the hotel and to spend $2.8 million on improvements over 5 years.

The Third Supplemental Lease dated March 6, 1969 (third supplemental lease), allowed the partnership to construct hotel additions or improvements on land previously designated for parking.

The Fourth Supplement to Lease by Way of Concession dated January 26, 1984 (fourth supplemental lease), extended the term of the 1957 lease through November 13, 2023, and required the partnership to spend at least $1.25 million on improvements in the initial 5-year period of the fourth supplemental lease and $500,000 on improvements in each subsequent 5-year period. The fourth supplemental lease also provided that all furniture and fixtures would become the property of the city upon termination of the 1957 lease, as amended. The minimum annual rent under the fourth supplemental lease was increased to $150,000 for the initial year of the fourth supplemental lease and was to increase by an additional $9,000 in each subsequent year of the fourth supplemental lease.

The Negotiation of Rent Credits

During the mid-to-late 1980s, the city was enjoying a business and civic rejuvenation following a difficult period. New highway construction facilitated access to the airport. At the same time, the hotel had fallen into disrepair.

The partnership was losing significant amounts of money on the hotel, with projected losses in excess of $500,000 each year

through 1997. The partnership was looking for a way to make the hotel profitable. The partnership believed that the rent under the 1969 lease was significantly above the prevailing market rate, and it was seeking rent relief to achieve its objective of making the hotel profitable.

The city was concerned about the condition of the hotel because the hotel was a visitor's first impression of Cleveland. The city wanted the hotel renovated to address the city's concerns and threatened to allow construction of a second hotel on the airport premises if the partnership failed to renovate the hotel. Construction of a second hotel on the airport premises would have put the partnership out of business.

The partnership did not have sufficient cash to make improvements to the hotel, so it attempted to expand its mortgage to cover the cost of improvements. The lender, American Real Estate Group, indicated that it believed the land rent on the hotel was substantially above market and conditioned any additional advance of funds on a substantial reduction in the land rent.

During 1987, the partnership informed the city that the partnership was unable to borrow additional funds to cover the cost of necessary repairs and improvements to the hotel. The partnership proposed a modification of the lease which would have increased the minimum annual rent to $300,000 but would have

decreased the percentage rent. The proposed change was expected to result in an overall decrease in rent.

Negotiations regarding the proposed improvements and the change to the rent under the lease ensued between the partnership and the city. The city was in a strong negotiating position because the economic climate in the city at that time was conducive to finding a new operator to construct and operate a new hotel if the city did not obtain the renovations the city wanted.

The partnership submitted to the city a modified proposal in which it again requested that the rent be reduced or, in the alternative, that the cost of improvements be credited against any land rent in excess of $300,000 per year. The city rejected that proposal but later submitted a counterproposal adopting the rent credit approach. The counterproposal allowed the partnership to credit the cost of certain eligible improvements against annual rent in excess of $300,000. The partnership accepted the counterproposal subject to requested changes.

The partnership was concerned with the profitability (or lack thereof) of the hotel and was agreeable to using either a rent reduction or rent credits to achieve its goal of making the hotel profitable. However, the parties believed that the Cleveland City Council, which had to adopt an ordinance approving any lease modification, was unlikely to agree to a rent

reduction. Additionally, the parties believed that it was more efficient for the partnership to make improvements than for the city to do so because it avoided the necessity of the City Council's having to approve each step of those improvements. The ultimate decision to structure the leases to include rent credits rather than a rent reduction was motivated by the foregoing concerns, not by tax considerations.

## The 1989 Lease Supplement

The Sixth Supplement to Lease by Way of Concession, dated August 11, 1989 (1989 lease supplement), increased the minimum annual rent from $195,000 to $300,000. The percentage rent remained unchanged. However, the 1989 lease supplement entitled the partnership to credits against the percentage rent for certain eligible improvements. Eligible improvements were defined in the 1989 lease supplement and were subject to approval by the city. The partnership was required to spend at least $900,000 every 3 years on eligible improvements. The rent credit in any given year was capped at $400,000, but any eligible improvements made in excess of that limit could be carried forward to future years.

## The 1990 Amended Lease

The partnership and the city executed the Amended and Restated Lease by Way of Concession dated December 31, 1990 (1990

amended lease).  The 1990 amended lease was effective during the years at issue and remains in effect through trial.

The 1990 amended lease extended the term of the 1957 lease for an additional 35 years.  It also permitted the partnership to demolish a portion of the hotel and to convert that area into a parking lot for hotel patrons and public parking patrons.

The 1990 amended lease required the partnership to renovate the hotel tower at a minimum cost of $5 million.  The costs related to the renovation were subject to approval by the city and were eligible for rent credits.  Additionally, the 1990 amended lease required the partnership to spend $1.5 million on improvements every 3 years.  Those expenditures also qualified for rent credits.

The 1990 amended lease increased the maximum amount of rent credit in any given year to $650,000 and allowed any eligible improvements made in excess of that limit to be carried forward to future years.

The Parking Lease

The partnership and the city also entered into a separate Amended and Restated Lease by Way of Concession dated December 31, 1990 (parking lease), allowing the partnership to operate a parking lot on the hotel property.  The parking lease was in effect during the years in issue and remained in effect through trial.

The parking lease required the partnership to demolish a portion of the hotel and in its place to construct and operate a parking lot and parking facility.

The parking lease required the partnership to pay annual rent equal to the greater of $100,000 or 10 percent of the gross revenues from parking operations.

The parking lease allowed the partnership a credit against percentage rent for eligible improvements.  Any eligible improvements in excess of percentage rent in a given year could be carried forward to be used as a credit against percentage rent in subsequent years.

The 1989 lease supplement, the 1990 amended lease, and the parking lease are sometimes hereinafter referred to collectively as the lease agreements.

The Rent Credit Process

At the start of each year the partnership provided the city with a detailed list of planned eligible improvements.  The city had the right to reject planned improvements and occasionally did so.  Pursuant to the lease agreements, a failure to comment by the city was deemed an approval.

At the end of each year the partnership submitted to the city a detailed list of expenditures along with documentation of those expenditures.  Pursuant to the lease agreements the city had the right to audit the detailed list of expenditures and

occasionally rejected items from the list.  Eventually, the partnership and the city agreed on what qualified as eligible improvements for that year.

Each year the partnership decided which eligible improvements the partnership would use for rent credit.  The partnership documented the eligible improvements the partnership was using to obtain rent credit on a detailed spread sheet provided to the city.  In accordance with the lease agreements, title to the eligible improvements vested in the city at the end of the year in which those improvements were credited against rent.

Generally, the partnership elected to receive rent credits for leasehold improvements rather than furniture, fixtures, and equipment (FF&E).  The partnership made that election in order to avoid the detailed inventory tracking requirements and the burdensome and unsightly tagging associated with FF&E.

When the partnership made eligible improvements, it accounted for them by recording them on its books as capital assets.  Where the partnership received a credit against rent for the full cost of an eligible improvement in the year that the improvement was made, it deducted that cost as a rent expense on its Federal income tax return for that year.  When an eligible improvement was not credited against rent in the year it was made, the partnership kept that eligible improvement on the books

as a capital asset and depreciated that asset in accordance with sections 167 and 168. When the partnership received a rent credit for an eligible improvement for which it had claimed a depreciation deduction in a previous year, it treated that as a sale of the eligible improvement for an amount equal to the rent credit and recognized gain, including depreciation recapture, as applicable. The partnership then deducted the cost of the eligible improvement as a rent expense in the year in which it was credited against rent.[4]

The partnership consistently followed the above procedure and that procedure was reviewed by two independent accounting firms.

OPINION

I.  Whether the Leasehold Improvements Were a Substitute for Rent

As a general rule, the Commissioner's determinations are presumed correct and the burden of proving an error is on the

_____

[4]Respondent disallowed the partnership's deduction of the cost of eligible improvements as a rent expense in all instances whether the deduction was claimed in the year the improvements were made or in a later year. Respondent's arguments, however, do not distinguish between the two situations, and we note that not all of the arguments are equally applicable to instances where the cost of eligible improvements was deducted in the year they were made (and so were never depreciated) and instances where the partnership depreciated the improvements before using them for rent credit. Since we are not convinced by any of respondent's arguments, we need not consider whether any of the arguments are a basis for disallowing the deduction in one instance but not in the other.

taxpayer.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  In the instant case, the parties agree that petitioner has the burden of proof.

Generally, section 162(a) allows as a current deduction from gross income all the ordinary and necessary expenses incurred in carrying on a trade or business.  However, sections 161 and 261 have the effect of subordinating provisions such as section 162(a) to provisions such as section 263(a)(1), thereby disallowing the current deduction of capital expenditures that otherwise would have been currently deductible trade or business expenses.  Commissioner v. Idaho Power Co., 418 U.S. 1, 17 (1974).  Unless some other special rule applies (see, e.g., section 263(a)(1)), a taxpayer's deductions for capital expenditures, if allowable at all, generally come by way of amortization or depreciation; i.e., the capital expenditure is deductible over a period of time.  Secs. 167, 168, and 169; INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 83 (1992).

Capital expenditures are, with limited exceptions, any amounts paid out for new buildings, permanent improvements, and restoration.  Sec. 263(a).  The parties agree that the eligible improvements in issue are capital expenditures within the meaning of section 263(a).

A taxpayer's entitlement to depreciation deductions for leasehold improvements hinges not on legal title but on a

recognized investment in the property.  <u>Gladding Dry Goods Co. v. Commissioner</u>, 2 B.T.A. 336, 338 (1925); see also <u>Mayerson v. Commissioner</u>, 47 T.C. 340, 350 (1966).  Consequently, the important question is whether the taxpayer made an investment of capital that the taxpayer is entitled to recover.  <u>Gladding Dry Goods Co. v. Commissioner</u>, <u>supra</u> at 338 ("The one who made the investment is entitled to its return.").  If a lessor makes improvements at the lessor's own expense, the lessor is entitled to depreciation deductions despite the fact that the lessee has the use and enjoyment of the improvements.  <u>Id.</u>  If a lessee makes improvements and the title to the improvements vests immediately in the lessor, the lessor's bare legal title does not preclude the lessee from recovering that lessee's investment through depreciation deductions.  <u>Id.</u>

Generally, where a lessee makes and invests in improvements on the property leased by the lessee, the lessee is entitled to recover that investment through depreciation deductions rather than through a current business expense deduction.  Sec. 1.162-11(b), Income Tax Regs.  There is, however, an exception where a lessee places improvements on real estate that constitute a substitute for rent.  In that case, section 1.61-8(c), Income Tax Regs., provides that the cost of the improvements made in lieu of rent is rental income to the lessor.  Section 1.61-8(c), Income Tax Regs., expressly addresses only the amount to be included in

the income of the lessor; it does not address the amounts, if any, that are deductible by the lessee. However, section 1.61-8(c), Income Tax Regs., does make clear that improvements in lieu of rent are rental income to the lessor, and rent is a currently deductible expense for a lessee under section 162(a)(3). Additionally, caselaw provides that, where an improvement is in lieu of rent, the amount invested in the improvement is currently deductible by the lessee as a rent expense. Your Health Club, Inc. v. Commissioner, 4 T.C. 385, 390 (1944); McGrath v. Commissioner, T.C. Memo. 2002-231, affd. without published opinion 92 AFTR 2d 6159, 2003-2 USTC par. 50,663 (5th Cir. 2003). Where improvements are in lieu of rent, the cost of those improvements is actually borne by the lessor through the rent credit, and the lessee has no capital investment to depreciate. Your Health Club, Inc. v. Commissioner, supra at 390.

Whether the value of improvements constitutes rent turns upon the intent of the parties to the lease. M.E. Blatt Co. v. United States, 305 U.S. 267, 277 (1938); Cunningham v. Commissioner, 28 T.C. 670, 680 (1957), affd. 258 F.2d 231 (9th Cir. 1958); McGrath v. Commissioner, supra; see also sec. 1.61-8(c), Income Tax Regs. The intent of the parties to the lease is derived from the terms of the lease as well as the surrounding circumstances. Cunningham v. Commissioner, supra at 680; sec. 1.61-8(c), Income Tax Regs. Even when the improvements are

required by the terms of the lease, they will not be deemed rent unless the intention of the parties to the lease to treat them as rent is plainly disclosed.  M.E. Blatt Co. v. United States, supra at 277.

We consider in the instant case whether the partnership and the city intended that the eligible improvements be a substitute for rent.  Respondent contends that petitioner failed to introduce evidence of the city's intent with respect to the lease agreements, alleging that petitioner relied only on the self-serving testimony of its own agents.[5]

Petitioner did introduce evidence of the intent of the parties to the lease agreements, most notably the lease agreements themselves.  Additionally, petitioner introduced the testimony of credible witnesses regarding the lease negotiations and the circumstances surrounding those negotiations.  Respondent did not discredit those witnesses at trial, nor did respondent introduce witnesses to rebut the testimony of petitioner's witnesses.

---

[5]Respondent also asserts that petitioner's failure to introduce testimony from the city gives rise to an inference under Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947), that the testimony would have been unfavorable.  However, Wichita Terminal applies to "the failure of a party to introduce evidence within his possession".  Id. (emphasis added).  It is inapplicable in this case because petitioner has shown that testimony of the city's agents who negotiated the lease agreements was unavailable.

In deciding the intent of the parties to the lease agreements, we first look at the express terms of the documents. Article IV.D of the 1990 amended lease states that the partnership "shall be entitled to receive a credit towards the payment of the annual Percentage Rent, in an amount equal to the cost of eligible improvements * * * which have been made and paid for prior to the completion of the lease year". The parking lease, in article IV, paragraph A.5, provides that the partnership "may deduct the cost of eligible improvements made and paid for in a lease year from any Percentage Rent due for that lease year." In Brown v. Commissioner, 22 T.C. 147, 148 (1954), affd. 220 F.2d 12 (7th Cir. 1955), we held that a similar provision requiring that the cost of improvements "'be credited to the Lessee from the rental due and owing by it under this lease'" resulted in income to the lessor. The express language of the lease agreements clearly indicates that the parties to those documents intended that the partnership's expenditures for eligible improvements were in lieu of its payment of percentage rent.

When determining whether the parties to the lease intended to treat the cost of improvements as a substitute for rent, consideration must be given to the surrounding circumstances in addition to the express language of the particular lease. Cunningham v. Commissioner, supra at 680. One relevant factor is

how the parties to the lease treated the expenditure for tax purposes over the course of the lease.  Brown v. Commissioner, 220 F.2d at 17 (lessee treated the cost of improvements as a rent expense, and the improvements were held to be a rent substitute); Cunningham v. Commissioner, supra at 681 (lessee treated the cost of improvements as a capital expense, not a rent expense, and the improvements were held not to be a rent substitute).  In the instant case, the partnership consistently treated the eligible improvements, both on its books and in its tax returns, as a deductible rent expense in the year that it obtained a rent credit for the cost of those eligible improvements.  That treatment is consistent with the express language of the lease agreements indicating that the eligible improvements were intended by the parties to the lease agreements to be in lieu of rent.

Respondent further argues that "Petitioner's claim that it was the intent of the parties to the lease that the petitioner's capital expenditures were to be made in lieu of rent is further undermined by the fact that the city * * * was a tax indifferent party", citing CMA Consol., Inc. v. Commissioner, T.C. Memo. 2005-16.  In CMA Consolidated, the presence of a tax indifferent party was a consideration in deciding whether the transaction lacked economic substance, but it is not probative on how the

parties intended to structure the transaction.[6]  In the instant

case, respondent has cited no case standing for the proposition

that tax indifference is a consideration in deciding whether the

parties to a lease intended capital expenditures to be made in

lieu of rent.  However, we have considered the tax indifference

of the city, and we are persuaded by the record that the city's

tax indifference did not play a significant role in the

negotiations between the city and the partnership or the city's

intent regarding the provisions of the lease agreements.

Accordingly, we conclude that the parties to the lease

agreements intended, as evidenced by the express language of the

leases and the surrounding circumstances, that the eligible

improvements be substitutes for rent.  Notwithstanding the intent

of the parties to the lease agreements to treat the eligible

improvements as substitutes for rent, respondent advances several

reasons the eligible improvements should not be treated as

deductible rent expenses.  We address each of these contentions

below.

II.  <u>Whether Rent Credits Must Be Limited in Duration or Amount</u>

Respondent contends that <u>Your Health Club, Inc. v.</u>

<u>Commissioner</u>, 4 T.C. 385 (1944) and <u>McGrath v. Commissioner</u>, T.C.

Memo. 2002-231 "can clearly be distinguished in that the rent

---

[6]We address the issue of economic substance below in sec.
IV.

substitute in both cases was limited to the initial start-up period of the business and the rent substitute made up only a small fraction of the amount claimed as a deduction for rent expense." While respondent correctly points out that in Your Health Club, Inc. the rent credit was limited to the initial year of the lease and was just under one-third of the total rent deduction for that year, those limits were imposed by the parties to the lease. In Your Health Club, Inc. this Court had no reason to consider a larger credit, and we in no way indicated that a larger credit would have been impermissible. In McGrath this Court did limit the amount allowed as a rent substitute. That limitation, however, was based on the intent of the parties to the lease, not on a decision that a larger or longer term rent credit would in all cases be impermissible or incorrect depending on the intent of the parties to other such leases. In McGrath we explicitly concluded that neither the lease nor the surrounding circumstances showed that the parties to the lease intended to treat the entire cost of the improvements as a rent substitute. As discussed above, in the instant case, the parties to the lease agreements did intend to treat the eligible improvements as a substitute for rent to the extent of the percentage rent each year. Accordingly, we conclude that respondent's argument that rent credits should be limited in duration and amount is not

supported by the cited cases and is inconsistent with the intent of the parties to the lease agreements.

III. Whether the Transfer of Eligible Improvements Was Illusory

In accordance with article VII.A of the 1990 amended lease and article VII.A of the parking lease, title to eligible improvements vested in the city in the year that those improvements were credited against rent, and the partnership treated each transfer as a deemed sale of the eligible improvement to the city in exchange for the rent credit. Respondent contends that the partnership's transfers of eligible improvements in exchange for rent credits were illusory. In support of that contention, respondent notes that the partnership retained control over and the right to the use of the transferred eligible improvements. Additionally, respondent contends that the partnership could not transfer the eligible improvements to the city because, under the lease agreements, title to those improvements would vest in the city at the end of the lease.

In deciding whether there has been a sale or exchange sufficient to transfer the depreciable interest in an asset from one taxpayer to another, this Court has looked at whether there was a transfer of the benefits and burdens of ownership. Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237 (1981). Grodt & McKay Realty, Inc. lists several factors relevant in

determining where the benefits and burdens lie.[7]  In the case of leasehold improvements, the balancing factors have  been refined by caselaw and the regulations, which provide us with significant guidance in deciding whether the benefits and burdens (and thus the depreciable interest) lie with the lessor or the lessee.

Depreciation is not predicated upon ownership of property but rather upon an investment in the property.  Mayerson v. Commissioner, 47 T.C. 340 (1966) (citing Gladding Dry Goods Co. v. Commissioner, 2 B.T.A. 336 (1925)).  Where leasehold improvements are involved, legal title and the right of possession and enjoyment are not determinative; the important question is whether the lessor or the lessee made the investment in those improvements.  Gladding Dry Goods Co. v. Commissioner, supra at 338.  Generally, where the lessor makes improvements at the lessor's own expense, it is the lessor that has a depreciable interest in the improvements.  Id.  If the lessee makes improvements at the lessee's expense, it is generally the lessee that has a depreciable interest in the improvements.  Id.; sec.

---

[7]These factors include:  (1) Which party to the transaction has legal title; (2) how the parties to the transaction treated the transaction; (3) whether equity was acquired by the purchaser; (4) whether the purchaser was required to make a present payment; (5) which party to the transaction had the right of possession; (6) which party to the transaction paid property taxes; (7) which party to the transaction bore the risk of loss; and (8) which party to the transaction received the profits generated by the property.  Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238 (1981).

1.162-11(b), Income Tax Regs.  However, where a lessee makes improvements as a substitute for rent, the lessee has no depreciable interest in those improvements.  Your Health Club, Inc. v. Commissioner, supra at 390.  Such a transaction is not different from one where the lessor paid for the improvements directly and the lessee paid the full rent.  Id.  When the lessor bears the cost of improvements via a rent credit, the lessor has an increased investment in the property, resulting in a higher basis and increased depreciation deductions.  Brown v. Commissioner, 22 T.C. at 151.

In the instant case, the partnership made the eligible improvements at its own expense.  To the extent that it received a rent credit in the year it made the improvements, it appropriately treated the cost of those improvements as a rent expense and deducted that cost currently.  See Your Health Club, Inc. v. Commissioner, 4 T.C. 385 (1944).  To the extent that the partnership did not receive a rent credit in the year that it made the eligible improvements, it had a depreciable interest in those improvements.[8]  See  Gladding Dry Goods Co. v.

---

[8]We note that had the eligible improvements been considered advance rent, the lessor would presumably have had the depreciable interest in those eligible improvements beginning in the year that they were made.  However, because the partnership often made eligible improvements in excess of those required under the lease, it was not certain which eligible improvements would eventually be credited against rent.  Accordingly, we conclude that the eligible improvements were not advance rent
(continued...)

Commissioner, supra at 338.  When the city credited the cost of an eligible improvement made in an earlier year against the partnership's rent, the city assumed the cost of that improvement, and the depreciable interest in that eligible improvement was transferred from the partnership to the city. With the cost of that improvement now borne by the city through the rent credit, the partnership no longer had a capital investment to depreciate.  See Your Health Club v. Commissioner, supra.  Accordingly, we conclude that the benefits and burdens surrounding the eligible improvements shifted from the partnership to the city in the year those improvements were "transferred" and credited against rent.

The partnership properly treated the transfer of its depreciable interest to the city in exchange for a rent credit as a deemed sale.  See United States v. Gen. Shoe Corp., 282 F.2d 9 (6th Cir. 1960).  The partnership claimed a rent expense deduction equal to the rent credit it received and treated the amount of that rent credit as the amount it realized on the transfer.  The partnership recognized gain to the extent that the rent credit exceeded its depreciated basis in the eligible improvement and effectively recaptured any depreciation claimed on the eligible improvement in prior years.

---

[8](...continued)
paid in the year they were made.

IV.  Whether the Rent Credit Arrangement Lacked Economic Substance

Even where a transaction complies with the formal requirements for obtaining a deduction, courts have long looked beyond that formal compliance and analyzed the substance of the transaction.  Knetsch v. United States, 364 U.S. 361 (1960); Gregory v. Helvering, 293 U.S. 465 (1935).  The taxpayer has the burden of showing that the form of the transaction accurately reflects its substance and that the deduction is permissible. IRS v. CM Holdings, Inc., 301 F.3d 96, 102 (3d Cir. 2002).

In the instant case, respondent contends that the rent credit provisions in issue  lacked economic substance and were not part of a bona fide business transaction.  In considering whether a transaction has economic substance, courts look at both the objective economic effect (i.e. whether, absent tax benefits, the taxpayer benefited from the transaction) and the subjective business motivation (i.e. whether the taxpayer was motivated by considerations beyond tax benefits) of the transaction.  Id.

In the instant case, the hotel was not profitable and was in need of renovation in order to have any hope of becoming profitable.  The partnership did not have the funds to renovate the hotel and was unable to borrow funds for the renovations with the lease arrangement structured as it was before 1989.  With the introduction of rent credits in the 1989 lease, the annual percentage rent did not change.  However, the partnership was

able to make improvements to the hotel and credit those improvements against its rent for the year.  Clearly, the rent credits provided a financial benefit to the partnership in that the partnership obtained the improvements that it wanted and needed and could reduce its rent on the basis of its cash outlay for the improvements.  The negotiation of the lease agreements to include rent credits provided the partnership with a significant benefit independent of any tax considerations.

Petitioner's witnesses testified that the partnership's goal in negotiating rent credits was to find a way to make the improvements to help it make a profit on the hotel.  Petitioner's witnesses also credibly testified that tax considerations were not discussed at the time of the negotiations and that it was only later that the partnership considered how the rent credits would be handled for tax purposes.

Petitioner also introduced credible testimony that the parties to the lease agreements chose rent credits over other alternatives for business, not tax, reasons.  The mentioned alternatives were for the city to make the improvements at its own expense or to grant the partnership reduced rent and allow (or require) the partnership to make the improvements.  Regarding the first alternative, there was concern that the City Council would be unwilling to approve a rent reduction.  There was also concern that, if the city made the improvements, it would involve

a cumbersome process of obtaining City Council approval repeatedly rather than the single City Council approval needed to modify the lease to include rent credits for improvements made by the partnership. The record shows and we conclude that the partnership's motivation in negotiating rent credits was to turn the hotel into a profitable enterprise and that the parties to the lease agreements had valid business reasons for choosing the rent credit structure over a lease providing for reduced rent.

Respondent makes much of the fact that the city is tax exempt. Where one of the parties is tax exempt, as is the city, there is potential for abuse. However, respondent points to no authority that would support a holding that a transaction involving a tax-exempt party cannot have economic substance. Respondent asserts that a taxable entity similarly situated with the city would not have accepted the lease terms involving rent credits. However, it is clear from the evidence that the city wanted to see the hotel renovated and was not simply going along with the partnership's proposal. For the reasons discussed above, we conclude that a taxable entity in the city's position could have favored the rent credit structure for business reasons, despite that fact that another structure might have produced greater tax savings for it.

We conclude that tax considerations were not a significant motivating factor in the negotiation of the rent credits. On the

basis of the record, we conclude that the rent credit arrangements in issue had a subjective business purpose. We also conclude that the rent credit arrangement had objective economic substance.

V.    Whether the Use of Rent Credits Clearly Reflected Income

If a taxpayer's method of accounting does not clearly reflect income, section 446(b) allows the Commissioner to compute taxable income under such method as, in the opinion of the Commissioner, does clearly reflect income. In the instant case, respondent asserts that the partnership's use of rent credits does not clearly reflect income because it "converts depreciable property to rent expense, computed at the historical cost of the asset, thereby inflating its deductions that significantly reduces taxable income". Respondent further alleges that the partnership is "clearly understating income" by taking a current deduction for the cost of long-term eligible improvements.

As respondent notes, a method of accounting clearly reflects income when it results in accurately reporting taxable income under a recognized method of accounting. RLC Indus. Co. & Subs. v. Commissioner, 98 T.C. 457, 491 (1992), affd. 58 F.3d 413 (9th Cir. 1995). "The Commissioner's determination with respect to clear reflection of income is entitled to more than the usual presumption of correctness, and the taxpayer bears a heavy burden of overcoming a determination that a method of accounting does

not clearly reflect income." Hamilton Indus., Inc. v. Commissioner, 97 T.C. 120, 128 (1991). The Commissioner has broad discretion but cannot require a taxpayer to change from an accounting method that clearly reflects income merely because the Commissioner considers an alternate method to more clearly reflect income. RLC Indus. Co. & Subs. v. Commissioner, supra at 491. If a taxpayer's method of accounting is authorized by the Internal Revenue Code or the underlying regulations and has been applied consistently, the Commissioner cannot arbitrarily require a change or reject the taxpayer's method. Id. We review respondent's determination for abuse of discretion. See Thor Power Tool Co. v. Commissioner, 439 U.S. 522 (1979).

As discussed above, the method of treating the cost of improvements credited against rent as a deductible rent expense has been accepted by both the courts and the regulations. See Your Health Club, Inc. v. Commissioner, 4 T.C. at 390; McGrath v. Commissioner, T.C. Memo. 2002-231; sec. 1.61-8(c), Income Tax Regs. In the instant case, respondent correctly points out that by treating the cost of improvements as a rent expense rather than depreciating (or continuing to depreciate) the costs, the partnership does increase its current deductions and reduce its taxable income in the year of the rent credit. However, since the partnership consistently accounted for its eligible improvements using an approved accounting method, respondent is

not at liberty to require the partnership to use a different method of accounting, even if respondent believes that another method would more clearly reflect income.[9]  See RLC Indus. Co. & Subs. v. Commissioner, supra at 491.

Respondent's concern with the use of historical cost is unfounded.  It is true that if the eligible improvements were not credited against rent in the year made, the partnership initially depreciated them.  However, in the year that the partnership received a rent credit for the eligible improvements, the partnership treated that as a deemed sale of the capital asset for an amount equal to the rent credit it received, which was equal to the historical cost of the eligible improvement.  By recognizing gain to the extent that the rent credit exceeded the partnership's depreciated basis in the eligible improvement, the partnership effectively recaptured any depreciation it had previously claimed on that improvement.  See United States v. Gen. Shoe Corp., 282 F.2d at 12-13.  By doing so, the partnership received the same deduction that it would have received if that eligible improvement had been credited against rent in the year it was made.  Accordingly, the use of rent credits computed at

---

[9]Respondent's proposed accounting method would have the partnership continue to depreciate the eligible improvements even after they are credited against rent.  Because the partnership no longer had a depreciable interest in the eligible improvements at that point, respondent's proposed method of accounting is not an authorized method of accounting and would not be a clear reflection of the partnership's income.

the historical cost of the improvements did not inappropriately increase the overall deductions; it merely accelerated the time at which the partnership claimed those deductions. While such an acceleration generally would not be permissible for a capital asset, as discussed above, there is an exception that applies in the instant cases that allows the current deduction of capital expenses that are incurred and credited as a substitute for rent. See Your Health Club, Inc. v. Commissioner, supra at 390; McGrath v. Commissioner, supra; sec. 1.61-8(c), Income Tax Regs.

Accordingly, we conclude that the partnership's method of accounting for eligible improvements made in lieu of rent did clearly reflect income and that respondent abused his discretion in determining that the partnership's method did not clearly reflect income.

## VI. Whether the Use of Rent Credits Was an Accounting Method Change

Section 446(e) provides that a taxpayer must secure the consent of the Secretary before changing his method of accounting.

> The reason for this rule is that a change in an accounting method will frequently cause a distortion of taxable income in the year of change; therefore, the Commissioner is empowered to prevent such distortion and consequent windfall to the taxpayer by conditioning his consent on the taxpayer's acceptance of adjustments that would eliminate any distortion. * * * [Woodward Iron Co. v. United States, 396 F.2d 552, 554 (5th Cir. 1968).]

In the instant case, respondent contends that the partnership's change from depreciating to deducting the cost of an eligible improvement in the year in which the partnership received a rent credit for such improvement is a change in accounting method. We disagree because, as discussed above, when the partnership received a rent credit for the cost of an eligible improvement, the depreciable interest in that eligible improvement was transferred from the partnership to the city. At that point, the partnership, as required by law, see Your Health Club v. Commissioner, supra at 390; Gladding Dry Goods v. Commissioner, 2 B.T.A. at 338, discontinued depreciating the eligible improvement because it no longer had an investment to depreciate. In the same year, the partnership deducted as a rent expense, as it was entitled to do by law, see Your Health Club, Inc. v. Commissioner, supra at 390; McGrath v. Commissioner, supra; sec. 1.61-8(c), Income Tax Regs., the value of the interest that it transferred to the city in partial satisfaction of its rent obligation. The partnership appropriately treated that transfer as the deemed sale of the eligible improvement. See United States v. Gen. Shoe Corp., supra at 12-13. Because the partnership recognized gain on that sale to the extent that its depreciated basis was less than the rent credit, it properly recaptured any depreciation previously claimed and there was no duplication of deductions. The method used by the partnership in

treating the matter as a deemed sale was used consistently throughout the term of the lease. Accordingly, we find that the partnership's treatment of eligible improvements did not result in an accounting method change.

VII. Whether Respondent Properly Proposed an Adjustment Under Section 481(a) for Taxable Year 2000

Where there is a change of accounting method, section 481(a) requires adjustments to prevent omissions or duplications and allows the Commissioner to include in the adjustment amounts that are attributable to taxable years for which assessment is barred by the statute of limitations. Hamilton Indus., Inc. v. Commissioner, 97 T.C. 120 (1991). As discussed above, because there has been no change of accounting method in the instant case, section 481(a) is not applicable.

VIII. Conclusion

On the basis of the foregoing, we conclude that the partnership and the city intended that eligible improvements be substitutes for rent; the leases in issue had economic substance and were not shams designed merely to reduce taxes; the partnership's treatment of eligible improvements was a clear reflection of income; the change from depreciating to deducting the cost of the eligible improvements in the year of a rent credit was not a change of accounting method; and the partnership appropriately deducted the cost of an eligible improvement as a rent expense in the year in which that eligible improvement was

credited against rent.

To reflect the foregoing,

<u>Decisions will be entered</u>

<u>for petitioner</u>.